IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

COLONIAL RIVER WEALTH    )
ADVISORS, LLC,    )
        Plaintiff,    )
    )
    v.    )    Civil Action No. 3:22cv717 (RCY)
    )
CAMBRIDGE INVESTMENT    )
RESEARCH, INC., *et. al.*    )
        Defendants.    )
    )

## MEMORANDUM OPINION

This matter is before the Court on Defendants Cambridge Investment Research, Inc.'s and Cambridge Investment Research Advisors, Inc.'s (together, the "Cambridge Defendants" or "Movants") Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(1) ("Motion to Dismiss") (ECF No. 17).  In this Motion, the Cambridge Defendants argue that the Court should dismiss Plaintiff's claims against them for lack of subject matter jurisdiction and compel the parties to arbitrate, because the dispute is subject to a binding arbitration clause.  The Motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated herein, the Court will grant the Motion to Dismiss (ECF No. 17) and dismiss all counts of the Amended Complaint leveled against Defendant Cambridge.

### I. RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff Colonial River is a Virginia company providing investment advice and other financial services.  (Am. Compl. ¶ 9, ECF No. 12.)  Its sole member is Devin Garofalo.  (*Id.*)  Defendant Jayne Di Vincenzo is an investment advisor who formerly operated Lions Bridge

Financial Advisors, Inc. ("Lions Bridge" or "the Business"), an investment advisor and securities brokerage business. (*Id*. ¶¶ 9, 15.)   In or around September 2019, Di Vincenzo received information that Garofalo and Colonial River might be interested in purchasing Lions Bridge. (*Id*. ¶ 20.)  On February 18, 2020, Garofalo, Colonial River, Di Vincenzo, and Lions Bridge entered into an Asset Purchase Agreement ("APA") pursuant to which Di Vincenzo and Lions Bridge (collectively, "Sellers") sold all of the Business's assets to Garofalo and Colonial River (collectively "Purchasers"). (*Id.* ¶ 21.)  The deal closed on March 3, 2020, when Colonial River wired $1.3 million to Di Vincenzo. (*Id*. ¶ 22.)

Among other provisions, the APA transferred Sellers' client accounts and business goodwill to Purchasers, including "[a]ll customer relationships, consumer lists, expiration lists, broker of record rights, rights to renew and related intangible rights and goodwill of the Business, including without limitation the Personal Goodwill . . . ." (*Id*. ¶ 24.)  To facilitate the transition in ownership, Sellers agreed to help encourage former clients to transition their accounts to Purchasers. (*Id*. ¶ 26.)

To protect Purchasers' interest in the Business's goodwill, Defendant Di Vincenzo agreed to restrictive covenants in the APA that "barred her from providing services to [Sellers'] former clients, from competing in the same geographical area, and from poaching employees from the [B]usiness or Purchasers." (*Id*. ¶ 3.)  These covenants included a provision that prohibited Sellers from providing any financial services to their former clients, a category defined as persons to whom Di Vincenzo and Lions Bridge had provided financial services within the 24 months preceding execution of the APA. (*Id*. ¶ 29.)  Further, Di Vincenzo was barred from competing with Purchasers within a prohibited area and forbidden from having a significant financial stake in any business competing with Purchasers within that area. (*Id*. ¶ 30.)  Finally, the APA forbid

Di Vincenzo from soliciting or hiring any employee of the Business or of Purchasers, from inducing any employee to end their relationship with the Business or Purchasers, and from using or sharing confidential information. (*Id*. ¶¶ 31–32.) These restrictive covenants were to last two years after Purchasers' final payment under the APA. (*Id*. ¶ 33.)

Plaintiff alleges that Defendant Di Vincenzo violated her obligations under these restrictive covenants, effectively attempting to retain and reconstitute the very business she had sold. (*Id*. ¶ 4.) Plaintiff contends that a key part of Defendant Di Vincenzo's scheme was to transfer client accounts from LPL Financial, LLC, the company providing broker-dealer services to the Business prior to its sale, to a new broker-dealer, Defendant Cambridge Investment Research Advisors, Inc., which was aware that Defendant Di Vincenzo's actions violated her obligations under the restrictive covenants. (*Id*. ¶¶ 5–6.) Additionally, Plaintiff alleges that Di Vincenzo sold the Business not to retire as she originally proffered, but rather in order to start a competing investor-advising business. (*Id*. ¶ 46.) In service of this new endeavor, Di Vincenzo and former Colonial River employee Kristen Forbes took confidential information from Colonial River and set up a new business as a Georgia LLC called "Fiduciary Edge Advisors, LLC". (*Id*. ¶¶ 47–48.) At the same time, she created a similarly named Virginia entity, "Fiduciary Edge Advisors LLC" from which she allegedly competed with Colonial River in further violation of the APA. (*Id*. ¶ 51.)

Di Vincenzo entered into a relationship with Defendant Cambridge Investment Research, Inc. ("Cambridge"), a broker-dealer, in order to help operate her new business. (*Id*. ¶ 54.) At some point, Di Vincenzo provided Cambridge with the APA, in violation of the APA's confidentiality provisions. (*Id*. ¶ 56.) After signing on as a Cambridge representative, Di Vincenzo induced several of her clients to transfer assets from LPL Financial to Cambridge. (*Id*. ¶ 57.) Upon

3

information and belief, Di Vincenzo also originated new clients by diverting Colonial River clients to Fiduciary Edge and Cambridge.  (*Id*. ¶ 59.)

Plaintiff claims that Cambridge was conscious of its wrongdoing and possible liability in this matter, in part because Purchasers sent a letter to Cambridge notifying it of Di Vincenzo's alleged breaches.  (*Id*. ¶¶ 60–62.)  Despite this warning, Cambridge continued to do business with Di Vincenzo, accepting both transfers and new clients from her.  (*Id*. ¶ 63.)  Cambridge then demanded that Di Vincenzo indemnify it from any losses stemming from her actions and memorialized this agreement in writing on September 14, 2020.  (*Id*. ¶¶ 64–65.)  Cambridge's broker-dealer relationship with Di Vincenzo continued for several months after finalizing the Indemnity Agreement, during which time she clawed back several of her former clients.  (*Id*. ¶¶ 68–69.)  Cambridge also provided Di Vincenzo with a letter for her to send to clients of Colonial River purporting to advise them of the non-solicitation restrictions but allowing them to decide whether to move their account to Cambridge and Di Vincenzo.  (*Id*. ¶ 70.)  Further, Cambridge agreed to an arrangement where it would hire Forbes but Di Vincenzo would pay her wages, which avoided the appearance of employment by Di Vincenzo.  Such as arrangement violates the APA. (*Id*. ¶ 72.)  Cambridge earned substantial fees through its role in Di Vincenzo's alleged violations. (*Id*. ¶ 74.)

On September 25, 2020, Di Vincenzo commenced a Financial Industry Regulation Authority ("FINRA") arbitration, FINRA Case No. 20-03366, against Garofalo and Colonial River.  (FINRA Award 1, ECF No. 18-1.)  That arbitration sought declaratory relief and asserted causes of action for breach of contract, breach of covenant of good faith and fair dealing, disparagement and defamation, fraud and misrepresentation, and tortious interference with business expectancy.  (*Id*. 3.)  Garofalo then filed a FINRA counterclaim seeking both injunctive

and declaratory relief and alleging tortious interference, defamation, fraud, misrepresentation, and breach of contract. (*Id*.) From December 6–14, 2021, the matter was arbitrated before a three-person panel. Ultimately, the arbitration panel found Garofalo liable, rejected Garofalo's counterclaims, and awarded Di Vincenzo over $2 million in compensatory damages, fees, and costs. (*Id*. 7–8.)

Garofalo commenced a second arbitration action, FINRA Case No. 20-03715, on November 30, 2020, against Di Vincenzo, Cambridge, and others arising out of the same asset sale transaction and underlying facts described in the Complaint. (Second FINRA Statement, ECF No. 18-2.) There, Garofalo states that Colonial River is a potentially interested entity in the arbitration, but not subject to FINRA jurisdiction. (*Id*. 26.) On January 17, 2023, counsel for Colonial River confirmed that it would not consent to participating in the arbitration voluntarily.

At the same time that Garofalo and Colonial River filed Counterclaims in the first FINRA action, they also filed an action in the Circuit Court for James City County and Williamsburg alleging the same claims. (Mem. Supp. Mot. Dismiss 2, ECF No. 24.) Colonial River and Garofalo nonsuited that action after Di Vincenzo filed a Motion to Dismiss. (*Id*.)[1]

Plaintiff Colonial River filed suit in this Court on November 10, 2022. (Compl., ECF No. 1.) On December 16, 2022, Plaintiff filed an Amended Complaint[2] against Defendants Cambridge Investment Research, Inc., Cambridge Investment Research Advisors, Inc. (collectively, the "Cambridge Defendants"), and Defendant Di Vincenzo, alleging five counts. (ECF No. 11.) The

_____

[1] On March 4, 2022, Di Vincenzo commenced an action in the Circuit Court for the City of Richmond to confirm the FINRA arbitration award, and Garofalo filed a cross-petition to vacate the award based on the alleged misconduct of one of the arbitrators and a claim that the arbitrators exceeded their power by awarding attorney's fees. (*See* Confirmation Opinion 1, ECF No. 80-1.) On June 8, 2023, the Circuit Court ruled in favor of Di Vincenzo and confirmed the award. (*Id*. 12–13.)

[2] On November 16, 2022, the Court had ordered Plaintiff to amend its pleading to clarify the basis for diversity jurisdiction. (Order, ECF No. 7.)

counts are as follows: Tortious Interference with Contract against the Cambridge Defendants (Count I), Tortious Interference with Business Expectancy against the Cambridge Defendants (Count II), Business Conspiracy against the Cambridge Defendants and Di Vincenzo (Count III), Common Law Civil Conspiracy against the Cambridge Defendants and Di Vincenzo (Count IV), and Breach of Contract against Di Vincenzo (Count V). (*See generally* Am. Compl.) In return, Di Vincenzo filed a Counterclaim alleging breach of contract. (Answer & Counterclaim, ECF No. 39.) On July 19, 2023, the Court granted Di Vincenzo's Motion to Dismiss, finding that Plaintiff's claims against Di Vincenzo were barred under a theory of claim preclusion. (ECF No. 84.)

On January 17, 2023, the Cambridge Defendants filed the instant Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(1). (ECF No. 17.) Plaintiff filed its Opposition to the Motion on January 31, 2023 (ECF No. 27), and Movants filed a Reply on February 6, 2023 (ECF No. 29).

## II. LEGAL STANDARDS

### A. Motion to Dismiss, Pursuant to Fed. R. Civ. P. 12(b)(1)

A motion under Fed. R. Civ. P. 12(b)(1) tests the court's subject matter jurisdiction. The plaintiff bears the burden of proving proper subject matter jurisdiction as the party asserting jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A 12(b)(1) motion can challenge subject matter jurisdiction in two ways. The first attacks the complaint on its face, asserting that it "fails to allege facts upon which subject matter jurisdiction can be based." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996). When such is the case, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id*.

Alternatively, a 12(b)(1) motion may challenge "the existence of subject matter jurisdiction in fact, quite apart from the pleadings." *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d

6

884, 891 (3d Cir. 1977).  Such a challenge places at issue the Court's power to hear the case.

*Walker v. U.S. Dep't of the Army*, 60 F. Supp. 2d 553, 555 (E.D. Va 1999).  The court "may then

go beyond the allegations of the complaint and in an evidentiary hearing determine if there are

facts to support the jurisdictional allegations . . . [and] may consider evidence by affidavit,

depositions or live testimony without converting the proceeding to one of summary judgment."

*Adams*, 697 F.2d at 1219.  The Court is free to weigh the evidence to determine the existence of

jurisdiction.  *Id.*

### B. Compelling Arbitration

Congress passed the Federal Arbitration Act ("FAA") "to reverse the longstanding judicial

hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing

as other contracts."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000) (quoting

*Gilmer v. Interstate/ Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)).  The FAA provides that a

written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The effect

of th[is] section is to create a body of federal substantive law of arbitrability, applicable to any

arbitration agreement within the coverage of the Act."  *Moses H. Cone Mem'l Hosp. v. Mercury

Constr. Corp.*, 460 U.S. 1, 24 (1983).

Once a court determines that the parties entered into a written agreement to arbitrate the

underlying dispute, Section 4 directs courts to compel arbitration if necessary.  9 U.S.C. § 4.  The

FAA gives district courts no discretion to do otherwise:

> By its terms, the Act leaves no place for the exercise of discretion by a district court,
> but instead mandates that district courts *shall* direct the parties to proceed to
> arbitration on issues as to which an arbitration agreement has been signed.  Thus,
> insofar as the language of the Act guides [the] disposition of [a] case, we would
> conclude that agreements to arbitrate must be enforced, absent a ground for
> revocation of the contractual agreement.

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4) (emphasis in original); *see Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001); *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001).

### III. ANALYSIS

The Cambridge Defendants styled their argument as a motion to dismiss for lack of subject matter jurisdiction, contending that, pursuant to the APA, Colonial River must arbitrate its allegations and that the arbitration clause in the APA supersedes and deprives the Court of subject matter jurisdiction.  However, this demonstrates an incorrect understanding of the interplay between the FAA and federal subject matter jurisdiction.  The Court will first address the issue of subject matter jurisdiction, then turn to the question of whether arbitration should be compelled.

#### A. Subject Matter Jurisdiction

Despite strong federal policy favoring arbitration, the FAA does not divest federal courts of otherwise-possessed subject matter jurisdiction over disputes subject to arbitration agreements. *See City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 880–81 ("[A]n arbitration agreement has no relevance to the question of whether a given case satisfies constitutional or statutory definitions of jurisdiction."); *see also Schwartz v. Coleman*, 1987 U.S. App. LEXIS 18703 (4th Cir. 1987); *Auto. Mech. Local 701 v. Vanguard Car Rental*, 502 F.3d 740, 743 (7th Cir. 2007) ("Enforcement of a forum selection clause (including arbitration clause) is not jurisdictional . . . ."). While a plaintiff's failure to comply with contract terms that require arbitration typically bar the *plaintiff's* ability to then sue in federal court, "it does not affect whether the *district court* possesses the power to hear the case." *Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, No. 3:13cv442, 2013 WL 5962939 at *3 (E.D. Va. 2013).  In the present matter, an obligation to arbitrate would impair Colonial River's right of access to the Court, but it does not

8

impact the Court's independent jurisdiction.  "[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002).  On that basis, the Court finds that Movants have not established grounds for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).

Rule 12(b)(1) aside, the Court still possesses the authority to grant other judicial remedies in relation to Colonial River's purported failure to bring its claims as an arbitration rather than civil suit.  *See Dominion Transmission, Inc.,* No. 3:13cv442, 2013 WL 5962939 at *4 (finding that, by virtue of its subject matter jurisdiction over the dispute, the Court could grant other judicial remedies in relation to a party's failure to comply with a contract's condition precedent).  Where a party seeks to invoke an arbitration clause, as here, the Court has discretion to stay or dismiss the civil action.  *Id.*; *see also Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001).  Accordingly, the Court analyzes Cambridge's arguments to determine whether either dismissal or a stay of proceedings is appropriate, albeit not pursuant to Fed. R. Civ. P. 12(b)(1).

### B. Standing of Cambridge to Compel Arbitration

Before evaluating whether or not Colonial River must arbitrate its claims, the Court must first address the question of Movants' standing to move to compel arbitration.  Plaintiff argues that because Movants were neither parties to the APA nor intended third-party beneficiaries of the Agreement, Movants lack standing to enforce the forum-selection (i.e., arbitration) clause.  (Mem. Opp'n Mot. Dismiss 6–7, ECF No. 27.)  Movants, however, responds that courts have allowed nonparties to an arbitration agreement to enforce or be bound by arbitration provisions under certain circumstances, most notably where "the issues the nonsignatory is seeking to resolve in

9

arbitration are intertwined with the agreement that the estopped party has signed." (Reply 5, ECF No. 29) (*quoting Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 779 (2d Cir.1995)).

The Fourth Circuit has endorsed the idea that principles of equitable estoppel can permit nonsignatories to enforce an arbitration clause against a signatory. *See Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005). The Circuit Court set out the following framework:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Id.*, 424 F.3d at 395–96 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citations omitted); *see also, Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417–18 (4th Cir. 2000) ("Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity."). Thus, to find that the Cambridge Defendants have standing to enforce the arbitration provision, the Court must determine that either (1) the issues in dispute are intertwined with the agreement that the signatory (here, Plaintiff) signed, or (2) there is a close relationship between the entities involved and the alleged wrongs and the contract, or (3) the claims are intimately founded in and intertwined with the underlying contract obligations.

In *American Bankers Ins. Groups, Inc. v. Long*, the Fourth Circuit reversed a district court decision that had denied a nonsignatory defendant's motion to compel arbitration against a signatory of an arbitration clause. 453 F.3d 623, 625 (4th Cir. 2006). There, Richard and Lillie

Long filed a class action suit against American Bankers Insurance Group (ABIG), among others, alleging their participation in a scheme to defraud investors through the sale of worthless securities. *Id*. ABIG was an underwriter to another seller of insurance policies and allegedly induced that seller to offer worthless promissory notes to the public and structured them such that ABIG was in the position of first priority in the event of default. *Id.* The Longs and the other seller later signed a Subscription Agreement containing an arbitration clause; ABIG did not. *Id.* Ultimately, the Fourth Circuit ruled in favor of the nonsignatory movant, ABIG, to find that the Longs' claims were founded in and reliant upon the underlying contract obligations, because the signatory-plaintiffs consistently maintained that other provisions of the Subscription Agreement—the same contract mandating arbitration—should be enforced to benefit them. *Id*. at 627, 630. The court concluded that "it would be inequitable to allow the Longs to seek recovery on their individual claims and at the same time deny that ABIG was a party to the Subscription Agreement's arbitration clause." *Id*. at 630.

The case at bar is in a similar posture. Here, Colonial River's claims against the Cambridge Defendants arise out of alleged breaches of the APA's restrictive covenants and related clauses—the same document that contains the disputed arbitration clause. "[I]t is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006) (internal quotation marks and alterations omitted). Further, the allegations against the nonsignatory Cambridge Defendants are deeply intertwined with the conduct of Defendant Di Vincenzo, who is a signatory to the APA. The Complaint alleges that a key part of Di Vincenzo's wrongdoing occurred when she transferred client accounts from LPL Financial, LLC, the company previously providing broker-dealer services to the Business, to her new broker-dealer Cambridge, and that Cambridge was aware that

11

Defendant Di Vincenzo's actions violated her obligations under the restrictive covenants.  (Compl. ¶¶ 5–6.)  Thus, any claims against Cambridge are inseparable from the acts allegedly committed by Di Vincenzo and thus from the APA.  As such, the Court holds that the Cambridge Defendants do have standing to enforce the arbitration clause against Colonial River.

### C. Language of the APA

Having established that the Cambridge Defendants have standing to enforce the APA's arbitration clause, the Court must now evaluate whether Colonial River is required to arbitrate at all.  In support of its Motion, the Cambridge Defendants first assert that the underlying issues of fact in this action are themselves subject to mandatory arbitration.  The parties have opposing interpretations of Article X, ¶ G of the APA, with the Cambridge Defendants reading it to compel arbitration in this matter, and Colonial River claiming to be subject to a different forum selection clause and to have no duty to arbitrate.  Article X, ¶ G reads as follows:

> Disputes, Jurisdiction, Waiver of Jury Trial: The Parties agree that any claim, suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the other agreements or transactions contemplated hereby shall only be brought in the state courts in the Commonwealth of Virginia or if applicable the Federal courts located in the Commonwealth of Virginia.  The parties agree that all lawsuits arising under or related to this Agreement shale [sic] be brought and remain the in [sic] General District or Circuit Courts of the City of Williamsburg and James City County.  Each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  The foregoing shall be subject to any duty to apply forms of dispute resolution as may be required by the Financial Industry Regulatory Agency.  In the event of any litigation or other legal proceedings the substantially prevailing party or parties, as determined by the judge or other presiding official, shall recover its reasonable attorney's fees incurred in such dispute from the other party or parties.

(Agreement, Art. X, ¶ G, ECF No. 18-2.)  Thus, APA parties Di Vincenzo, Garofalo, and Colonial River were contractually obligated to resolve any disputes in either state or federal courts within

Virginia, except for where there was a duty to apply the "forms of dispute resolution" required by FINRA.

The duty to arbitrate through FINRA is codified in FINRA Rule 13200(a), which reads that "Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons."  The parties agree that Colonial River is not a FINRA member or associated person, and that it did not voluntarily submit to arbitration previously.  (Mot. Dismiss 7; Mem. Opp'n Mot. Dismiss 9.)

In *UBS Financial Services, Inc. v. Carilion Clinic*, plaintiffs UBS and Citi Bank argued that language in the parties' broker-dealer agreement requiring proceedings to be brought in New York courts, and waiving a right to trial by jury, superseded and displaced the parties' obligation to arbitrate through FINRA.  706 F.3d 319, 328 (4th Cir. 2013).  Although the Court agreed that FINRA rules can be superseded by a more specific contractual agreement, the clause contained in the broker-dealer agreement failed to clearly indicate an intent to displace the arbitration obligation.  Any provision seeking to override FINRA rules "must be sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200," the Court wrote.  *Id.*

The forum selection clause in Art. X, ¶ G is less ambiguous than the clause at issue in *Carilion*.  The sentence "[t]he foregoing shall be *subject to* any duty to apply forms of dispute resolution as may be required by the Financial Industry Regulatory Agency," clearly limits the forum selection clause and makes clear that it was not intended to displace existing FINRA obligations.  Plaintiffs state that the clause "does not establish any new arbitration obligations between the parties." (Mem. Opp'n Mot. Dismiss 8.)  However, the provision in question requires

arbitration where there is "any duty" to arbitrate among the signatories, not necessarily where Colonial River had an individual duty.  Even where there may be multiple interpretations, "ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Volt Info. Scis, Inc. v. Bd. of Tr. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475–76 (1989); *see also Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989) ([W]hen the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration."); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960) ("An order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.").  Because the dispute stems from the business activities of Cambridge, a FINRA member, and is between and among Di Vincenzo, Garofalo (both FINRA associated persons) and non-member Colonial River, FINRA Rule 13200(a) applies, and thus the forum selection clause relied upon by Plaintiff is rendered moot and arbitration is required.

### D. Agency, Alter Ego, and Estoppel

Though the Court has determined that the language in Art. X, ¶ G requires arbitration, this Opinion will also address the parties' arguments that alternative theories may further compel arbitration.  Although a party cannot be compelled to submit to arbitration where it has not contractually agreed to submit to said arbitration, "it does not follow that . . . an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Int'l Paper Co.*, 206 F.3d at 416 (quoting *Fisser v. Int'l Bank,* 282 F.2d 231, 233 (2d Cir. 1960) (internal citations omitted)).  A third party may be subject to a contract's arbitration clause through the legal theories of agency, alter ego, and estoppel.  *Id*. at 416–17.  The Cambridge Defendants contend that each of those theories binds Colonial River to FINRA Arbitration.

The Court is not convinced that the Cambridge Defendants sufficiently established that Colonial River is the agent of Garofalo, nor that Colonial River is Garofalo's alter ego. While Garofalo does have complete control over Colonial River as its sole member, the concept of agency in the context of limited liability company is complex. In Virginia, "a limited liability company is a legal entity entirely separate and distinct from the shareholders and members who compose it." *Mission Residential, LLC v. Triple Net Props, LLC*, 654 S.E.2d 888, 891 (Va. 2008). According to the Restatement of Agency, "an agency relationship exists when a principal 'manifests assent' to an agent 'that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act'." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 659–60 (4th Cir. 2019) (quoting Rest. (3d) of Agency, § 1.01). Here, the Cambridge Defendants offered little evidence that Garofalo assented to Colonial River's role as an agent beyond the fact that Garofalo is Colonial River's sole member. Under Virginia precedent, that alone is not enough to establish agency.[3]

Similarly, the Cambridge Defendants' assessment that Garofalo used Colonial River as an alter ego is unconvincing. While it is true that the parties' interests are united, there mere fact that Colonial River, a distinct corporate form, benefits from Garofalo's FINRA membership is not itself evidence that Garofalo is using the LLC to "evade a personal obligation, to perpetuate a fraud

---

[3] In light of the Court's earlier Memorandum Opinion addressing Defendant Di Vincenzo's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), the Court notes that agency and privity are similar but distinct concepts. Privity between parties exists when a party is so unified in interest with a party to the prior litigation that he represents precisely the same right with respect to the subject matter involved; it requires a substantial identity between the issues in controversy and a showing that the parties in the two actions are in interest the same. *See Weinberger v. Tucker*, 510 F.3d 486, 491–92 (4th Cir. 2007); *Londono-Rivera v. Virginia*, 155 F. Supp. 2d 551, 565 (E.D. Va. 2001). However, unlike agency, privity does not require or assume that one party assented to act on behalf of the other. Though they might represent one another in-fact within the preclusion context, parties in privity are not de facto agents.

In the present matter, the Court declines to assume that Garofalo and Colonial River had an agency relationship as the Cambridge Defendants only rely on Garofalo's membership status, rather than evidence of actual agency, in making their argument. However, this should not be read to undermine or alter the Court's conclusion in a prior opinion that Garofalo and Colonial River are privies for preclusion purposes.

or a crime, to commit an injustice, or to gain an unfair advantage." *Newport News Hldgs Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434 (4th Cir. 2011) (*quoting C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 132 (4th Cir. 2002) (internal quotations omitted)).

However, the Court agrees with the Cambridge Defendants' third argument, that Colonial River is estopped from asserting a lack of FINRA jurisdiction. As was alluded to in the portion of this Opinion discussing the Cambridge Defendants' standing, a nonsignatory will be estopped from arguing that an arbitration provision does not apply when his underlying claims seek a direct benefit from the contract containing the arbitration clause. *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 162 (4th Cir. 2004); *see also Int'l Paper*, 206 F.3d at 418 ("In the arbitration context, [equitable estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him."). That is precisely what Colonial River does throughout this civil action. Colonial River, having sought the advantages of Garofalo's status as a FINRA associated person by having previously arbitrated many of the claims at issue in this suit, now attempts to circumvent FINRA's arbitration requirements to obtain a more favorable outcome. "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act." *Avila Group, Inc. v. Norma J. of Ca.*, 426 F. Supp. 537, 542 (S.D.N.Y. 1977).

### E. Dismiss or Stay the Action

Finding that this action is subject to mandatory arbitration, the Court must determine whether to stay or dismiss the suit. "A court may dismiss or stay a suit that is governed by the FAA." *Chronister v. Marks & Harrison, P.C.*, No. 3:11cv688, 2012 WL 966916, at *2 (E.D. Va.

Mar. 21, 2012) (citing 9 U.S.C. § 3; *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001)).  When a party seeks enforcement of an arbitration agreement in district court, the party sufficiently "invoke[s] the full spectrum of remedies under the FAA, including a stay under [9 U.S.C.] § 3."  *Choice Hotels*, 252 F.3d at 710.  However, if a court determines "that all of the issues presented are arbitrable, then it may dismiss the case." *Greenville Hosp. Sys. v. Emp. Welfare Ben. Plan for Emps. of Hazelhurst Mgmt. Co.*, 628 F. App'x 842, 845–46 (4th Cir. 2015) (citing *Choice Hotels*, 252 F.3d at 709–10).  In light of this permissive precedent and in the interest of judicial economy, the Court opts to dismiss the Complaint without prejudice, for resolution in a more appropriate arbitral forum.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant the Cambridge Defendants' Motion to Dismiss (ECF No. 17) as to all of Plaintiff's claims against Movants in the Amended Complaint. An appropriate Order will accompany this Memorandum Opinion.

_____  /s/

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: July 24, 2023